

**The following constitutes
the order of the court. Signed November 5, 2014**

_____
**Charles Novack
U.S. Bankruptcy Judge**

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re:<br>MAC-GO CORPORATION,<br>      Debtor. | Case No. 12-50118 CN<br>Chapter 7 |
| MOHAMED POONJA, Trustee,<br>      Plaintiff,<br>vs.<br>FIRST NATIONAL BANK,<br>      Defendant. | Adversary No. 14-4148<br><br>**MEMORANDUM DECISION** |

      On August 27, 2014, this court conducted a trial in this adversary proceeding on the avoidance claims asserted by plaintiff Chapter 7 trustee Mohammed Poonja against defendant First National Bank. The Trustee seeks to avoid several pre-petition claims as preferential transfers under Bankruptcy Code § 547(b), and several post-petition transfers under Bankruptcy Code § 549. The following constitutes this court's findings of fact and conclusions of law under F.R.B.P. 7052.

      The underlying Chapter 7 bankruptcy was filed as an involuntary bankruptcy petition against Debtor Mac-Go Corporation ("Mac-Go") on January 6, 2012. This court entered an Order for Relief on February 12, 2012, and Mohamed Poonja is the duly appointed Chapter 7 trustee (the "Trustee").

      Debtor Mac-Go Corporation ("Mac-Go") operated a wholesale auto parts and oil business at several locations in the Bay Area. At all relevant times, Mac-Go was wholly owned by Michael and

Memorandum Decision

Elizabeth Macchia.

In February 2006 the Macchias borrowed two million dollars from First National Bank ("First National" or the "Bank"), which was secured by real property that they owned at 267-273 East Harris Avenue, South San Francisco, California (the "SSF Loan"). When they executed the SSF Loan, the Macchias apparently represented to the Bank that Mac-Go was leasing the SSF premises under a lease dated August 24, 2004. To document the SSF Loan, the Macchias signed a promissory note and a deed of trust against the SSF property, and they and Mac-Go executed a Subordination Agreement under which the Macchias subordinated their interest in SSF lease to the Bank's rights under the deed of trust. The Bank also requested that Mac-Go guarantee the SSF Loan, and Mac-Go executed a form Commercial Guaranty, dated February 13, 2006. In this three page, single-spaced document, Mac-Go unconditionally and absolutely guaranteed full payment of the SSF Loan.

The SSF Loan required monthly payments of $13,598.12 commencing on March 13, 2006 until loan maturity on February 13, 2016. The SSF loan payments were due on the first of each month and late by the fifteenth. If the fifteenth of the month fell during the weekend or a holiday, the payment was due no later than the next business day. Mac-Go, rather than the Macchias, made the SSF loan payments, and it made each monthly payment by electronic transfer to the Bank. All of Mac-Go's payments were timely made, and the SSF Loan was fully satisfied when the SSF property was sold in early 2012.

The Macchias borrowed an additional $1.105 million dollars from First National in September 2006. They secured this loan with a deed of trust against real property located at 665 North Pioneer Avenue, Woodland, California (the "Woodland Loan."). When they executed the Woodland Loan, the Macchias apparently represented to the Bank that Mac-Go was leasing the Woodland premises under a lease dated April 8, 2006. The Macchias signed another form promissory note and deed of trust, and Mac-Go and the Macchias executed another subordination agreement in the Bank's favor. Under the Continuing Guaranty, Mac-Go was also liable on the Woodland Loan.

The Woodland Loan required monthly payments of $7,932.87 commencing on October 11,

2006 through November 15, 2011, at which time the monthly payment dropped to $5,851.06 (with a maturity date of September 29, 2016). These payments were due by the fifteenth of every month and late by the 25th of every month. The Woodland Loan went into default in July 2012. Before that date, Mac-Go made all but the last three or four monthly payments (which presumably were made by the Macchias). During the more than five years that Mac-Go made the Woodland Loan payments, only a handful of its payments were assessed late charges.[1]

Michael Macchia, Mac-Go's president, testified that he leased four properties to Mac-Go. The only leases introduced into evidence, however, were a Woodland property lease that ran from May 2001 through May 2006, and a SSF property lease that ran from January 2001 through January 2006. Macchia testified that during the time in question, Mac-Go's rent for all four properties was between $40,000 and $45,000/month. He could not allocate, however, any specific amount of rent amount to any particular property. Macchia's testimony regarding how this rent was paid was confused at best. He continually contradicted himself regarding whether (and when) he credited Mac-Go's Woodland and SSF Loan payments as rent, and if so, what financial records demonstrated this.

In August 2011, Mac-Go tentatively agreed to sell its operations to Hunt & Sons. As a result, virtually all of Mac-Go's sales staff left Mac-Go's employ and began working for Hunt & Sons. Hunt & Sons ultimately withdrew its offer, and Mac-Go, bereft of sales people, began to liquidate its inventory during the fall of 2011. Unfortunately, Macchia's testimony regarding Mac-Go's liquidation process is just as confusing as his testimony regarding the property leases. Macchia stated that he sold inventory from the SSF property from September 2011 to February 2012, and could not recall the amount of these sales. Mac-Go vacated these premises in February 2012 when he sold the SSF property. He did not recall if he sold any inventory from the SSF property during the involuntary "gap" period. As for the Woodland property, Macchia testified that he used these premises post-petition to store Mac-Go's remaining inventory, which included miscellaneous oil drums, pipe, meters, tanks, tires, and wheels. While Macchia did not know the value of this

---

[1] And these payments were only marginally late.

3

inventory, his personal bankruptcy counsel (Macchia filed a personal Chapter 11 bankruptcy on September 27, 2012), asserted that these items had "no sale value."[2] The Trustee testified that the Mac-Go bankruptcy estate never used the Woodland premises for any purpose.

First National did not know that Mac-Go terminated its normal sales operations in August/September 2011, and it did not engage in any pre-petition collection activity beyond its regular receipt of the SSF and Woodland Loan payments.

**THE PREFERENCE PAYMENTS**

The Trustee seeks to avoid as preferential transfers 1) an October 17, 2011 payment on the SSF Loan for $13,598.12; 2) an October 24, 2011 payment on the Woodland Loan for $7,932.87; 3) a November 23, 2011 Woodland Loan payment for $5,851.06; and 4) a December 22, 2011 Woodland Loan payment for $5,851.56 (collectively, the "Payments").

Bankruptcy Code § 547(b) authorizes the Trustee to avoid transfers of "an interest of the debtor in property (1) to or for the benefit of a creditor; (2) for or on account of an antecedent debt owed by the debtor before such transfer was made; (3) made while the debtor was insolvent; (4) made - (A) on or within 90 days before the date of the filing of the petition; ... and (5) that enables such creditor to receive more than such creditor would receive if - (A) the case were a case under chapter 7 of this title; (B) the transfer had not been made; and (C) such creditor received payment of such debt to the extent provided by the provisions of this title."

The Trustee satisfies each of these elements. This court already has determined that Mac-Go was liable on the SSF and Woodland Loans under the Continuing Guaranty (see Order on Summary Judgement dated May 23, 2014 [D.E. #80]). The Payments were made within ninety days of the Chapter 7 petition date, and the presumption that Mac-Go was insolvent (see Bankruptcy Code § 547(f)) went unrebutted. Finally, the court rejects First National's argument that the Trustee did not prove by a preponderance of the evidence that the Payments allowed the Bank to receive more than it would have in a hypothetical Chapter 7 case. The Trustee testified that based on the funds recovered

---

[2] Macchia's bankruptcy counsel filed a motion to compel Poonja to abandon this property in May 2013. The motion went unopposed.

and the claims filed, the general, unsecured creditor class would receive an 11% dividend (the Bank did not file a proof of claim). Under applicable Ninth Circuit law, since the general unsecured creditor class (of which the Bank would have been a member had it filed a claim) is receiving less than a 100% dividend, any payment made within the ninety day preference period provides the creditor with a larger payment on account of its claim that what it would receive in a Chapter 7 case. See *In re Lewis W. Shurtleff, Inc.*, 778 F.2d 1416, 1417 (9th Cir. 1985); *In re Powerine Oil Co.*, 59 F.3d 969 (9th Cir. 1995).

Regardless, the Trustee cannot avoid and recover the Payments. First National has demonstrated that the Payments were made in the ordinary course under Bankruptcy Code § 547(c)(2). Under this code section, the Trustee cannot avoid a transfer "to the extent that such transfer was in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee, and such transfer was - (A) made in the ordinary course of business or financial affairs of the debtor and the transferee; or (B) made according to ordinary business terms." The Bank, which bears the burden of establishing this affirmative defense, satisfies the requisite elements. First, whether the underlying debt was made in the ordinary course of the transacting parties' business or financial affairs "is usually easily satisfied in the case of transactions with unrelated parties for general business purposes." *In re Pajaro Dunes Rental Agency*, 174 B.R. 557, 600 (Bankr. N.D.Cal. 1994). This case is no exception to that rule. These loans involved fairly substantial sums, and they were secured by real property on which Mac-Go operated its wholesale auto parts and oil business. Mac-Go was purportedly paying rent to the Macchias when First National lent these funds to the Macchias, and the Macchias subordinated their right to collect Mac-Go rent to First National's rights under the Woodland and SSF Loans. It should come as no surprise that the Bank wanted further "security" in the form of a guaranty by an entity wholly owned by its borrowers which was renting the premises. Moreover, there are two such loans, which create the financial track record required by Bankruptcy Code § 547(c)(2). Second, the Bank's records readily establish that the Payments were made in the ordinary course of the parties' business/financial affairs. "A transfer is made in the ordinary course of business if it is proved to be within the prior course of business of the debtor and the transferee." *In re Powerine Oil, Co.*, 126

5

Memorandum Decision

B.R. 790, 795 (Bankr. 9th Cir. 1991). The SSF Loan payments in question were timely made by electronic transfer (as were all of Mac-Go's SSF Loan payments). The Woodland Loan payments in question were all made within the grace period, and therefore were also timely (which was typical of Mac-Go's Woodland Loan payments).[3]

First National also contends that the Payments were contemporaneous exchanges for new value under Bankruptcy Code § 547(c)(1). This code section provides that the Trustee may not avoid a transfer that was "(A) intended by the debtor and the creditor to or for whose benefit such transfer was made to be a contemporaneous exchange for new value given to the debtor; and (B) in fact a substantially contemporaneous exchange."

Under § 547(c)(1) "a transaction is not a preferential transfer, even if made on the eve of bankruptcy, if a creditor provides new value in exchange for debtor's contemporaneous transfer . . . . Other creditors are not adversely affected by such an exchange because the debtor's estate has received new value. Moreover, this exception encourages creditors to continue dealing with a troubled company, which may allow the company to escape bankruptcy altogether." *In re Dorholt, Inc.*, 224 F.3d 871, 873 (8th Cir. 2000).

The Bank must demonstrate by a preponderance of the evidence that the Payments were made in exchange for new value, that the new value was contemporaneous, and that the parties intended the transaction to be a contemporaneous exchange of new value. The Bank has not met this burden. The Bank does not contend that it provided new value or had the requisite intent. Instead, First National argues that Macchia provided the new value (and intent) by crediting the Payments as rent for the various premises occupied by Mac-Go. While courts have recognized that multi-party transactions can satisfy this affirmative defense (*see, e.g., In re Fuel Oil Supply & Terminaling, Inc.*, 837 F.2d 224 (5th Cir. 1988)), this is not one of those transactions. First, the Bank has not sufficiently demonstrated that Macchia acknowledged the Payments as rent. Macchia was a thoroughly unconvincing and less than forthright witness, and his testimony regarding what these

---

[3] Under the circumstances of this case, the fact that Mac-Go made these payments while it was liquidating is of no consequence.

Payments represented (beyond payments on the SSF and Woodland Loans) was confusing and inconsistent with his testimony regarding when and if Mac-Go directly paid rent to him (along with its SSF and Woodland Loan payments to the Bank). Indeed, Macchia could not even state what the rent was for the Woodland and SSF premises, and it therefore came as no surprise that neither party introduced into evidence any Mac-Go financial record demonstrating that Mac-Go treated the Payments as rent. Moreover, in deciding that the Mac-Go's payments on the SSF and Woodland Loans were not avoidable as fraudulent transfers under §548(1)(B), this court held that Mac-Go received "value" for its payments on the SSF and Woodland Loans in the form of reduced liability under the Continuing Guaranty—not as payments pursuant to a lease with the Macchias. Finally, Macchia and his wife were personally liable on the SSF and Woodland Loans, and it is easy to conclude that Mac-Go made the Payments simply to avoid any demand on the Macchias.

## THE POST-PETITION PAYMENTS

The Trustee also seeks to avoid three post-petition payments made by Mac-Go to First National: 1) a $5,851.06 payment made on January 13, 2012 on the Woodland Loan; 2) another $5,851.06 payment made on February 1, 2012 on the Woodland Loan; and 3) a February 1, 2012 $13,598.12 payment on the SSF Loan (collectively, the "Post-Petition Payments"). The Trustee contends that he can avoid the Post-Petition Payments under Bankruptcy Code § 549(a), which provides that "Except as provided in subsection (b) and (c) of this section, the trustee may avoid a transfer of property of the estate - (1) that occurs after the commencement of the case; and (2)(A) that is authorized only under section 303(f) or 542(c) of this title; or (B) that is not authorized under this title or by this court."

The Bank concedes that it received the Post-Petition Payments after the involuntary case was commenced, and that they were not authorized under §§ 303(f) or 542(c). Instead, First National relies on § 549(b), which states that "In an involuntary case, the trustee may not avoid under subsection (a) of this section a transfer made after the commencement of such case but before the order for relief to the extent any value, including services, but not including the satisfaction or securing of a debt that arose before the commencement of the case, is given after the commencement of the case in exchange for such transfer, notwithstanding any notice or knowledge of the case that

7

Memorandum Decision
Case: 14-04148    Doc# 96    Filed: 11/05/14    Entered: 11/05/14 15:38:21    Page 7 of 10

the transferee has." The Bank contends that Mac-Go received value in exchange for the Post-Petition Payments, arguing again that Mac-Go occupied the Woodland and SSF premises post-petition (which allegedly required the payment of rent, which the Bank claims were made in the form of the Post-Petition Payments). Simply, the evidence does not establish that the Post-Petition Payments were rent payments. Instead, there is ample evidence demonstrating that the Post-Petition Payments were solely used to satisfy Mac-Go's obligations under the Continuing Guaranty. As stated above, this court gives Macchia's testimony short shrift, and Macchia was not a credible witness on Mac-Go's post-petition operations. Furthermore, the Bank did not present any Mac-Go financial record establishing that the Post-Petition Payments constituted rent, and the Trustee's accountant testified that no such contemporaneous record existed (or could be found).[4] As stated above this court can just as easily conclude that Mac-Go made the Post-Petition Payments to avoid the Bank making a demand on the Macchias. Finally, the evidence does not conclusively satisfy what property the bankruptcy estate occupied during the gap period. Accordingly, the Post-Petition Payments are avoided under Bankruptcy Code § 549(a).

Curiously, the Trustee's pre-trial brief make no mention of his final claim for relief for declaratory relief. There, the Trustee seeks declaratory relief that all of the Bank's secured loans were satisfied before the "Petition Date." The Stipulation referenced in this claim for relief states that the Bank's secured loans were satisfied after the petition date but before the entry of the order

---

[4] In fact, the Trustee's accountant mentioned that Mac-Go may have credited the Payments and Post-Petition Payments to a "shareholder account" established to account for Macchia's corporate loans to Mac-Go. Given the unreliable nature of Mac-Go's books, the court mentions this testimony as further evidence of the Bank's difficult task in establishing its affirmative defenses.

In addition, the November 19, 2013 deposition testimony of Stephen Cook will not be admitted under Federal Rule of Evidence 804)(a)(4). As the court noted on the record, the evidence did not demonstrate that Cook had a *present* infirmity, physical illness or mental illness that prevented him from attending trial. While Cook stated during his deposition that he would need a paramedic vehicle with a wheelchair to attend trial, the court does not know whether his unidentified infirmity persisted through the day of trial, and why a wheelchair bound witness cannot attend a trial in a federal courtroom.

Finally, given the court's rationale regarding the Trustee's § 549 claims for relief, it need not rule on the admissibility of Exhibits M and N, which represent the expert analysis of Ryan Lorenzini, MAI regarding the market rent value of the SSF and Woodland properties.

8

Case: 14-04148   Doc# 96   Filed: 11/05/14   Entered: 11/05/14 15:38:21   Page 8 of 10

for relief. The evidence at trial demonstrated that the SSF Loan was satisfied on March 9, 2012 (after the February 12, 2012 entry of the order for relief), and that the Woodland Loan was satisfied on January 27, 2012 (after the filing of the involuntary petition but before the entry of the order for relief). These were the only First National loans discussed at trial. Accordingly, the court cannot find that the SSF and Woodland Loans were fully satisfied before the petition date.

Both the Trustee and First National in their post-trial briefs contend that this declaratory relief claim somehow controls First National's right to attorneys fees. The court will not consider this issue in a vacuum. If First National contends that it is entitled to attorneys fees as a result of this court's findings, it may file a motion seeking those fees.

The Trustee may submit an appropriate form of judgment.

\* \* \* END OF ORDER \* \* \*

COURT SERVICE LIST

Recipients are ECF participants